Good morning, Your Honors, and may it please the Court, given the time constraints and the fact that if the Court rules for NOVA on indefiniteness, it needn't reach the other issues in the case, I'm going to focus on indefiniteness and leave the other issues to the briefs. Could I understand the difference between the two cases? I understand that in this case you're challenging the supplemental damages, that this has nothing to do with the original judgment. That's correct. So in the second case, you're challenging the original judgment. That's correct. All right. Dow argues that the Supreme Court in Nautilus made no change to the law justifying a departure from what I call Dow One, the earlier panel decision, since Dow One doesn't use the magic word, insolubly ambiguous and amenable to construction. But the fact is that the Dow One did use other phrases which were rejected by the Supreme Court in Nautilus, and one of them was no narrowing construction, and one of them was the equivalent of if some meaning can be gleaned from the claims, when the Court held that whether the meaning of the claim is discernible, even though the task is formidable and the conclusion is one of which reasonable persons will disagree. I appreciate what you're going to say, but let me just ask you, there was extensive reliance on the expert testimony in the first case. That's still permissible, is it not, under Nautilus? Or is there some distinction with regard to the nature of the claim? It is permissible, Your Honor, but the focus is on the spec and the prosecution history. The Nautilus One remand says that, and the Supreme Court says that, but you still have to look at the spec and the prosecution history. Well, what about the temporal aspect of it? For example, in Nautilus, the Supreme Court's opinion in Nautilus does speak to experts, but it also says repeatedly, at the time of the invention, at the time of the application. So it brings you back to that. Is that a notable distinction that's applicable to this case? You have to look at the time of the application. But I would direct you to one quote, which I have. It's a Supreme Court case, Brookgrove v. Brown v. Williamson, and it says, when an expert opinion is not supported by sufficient facts to validate it in the eyes of the law, or when indisputable record facts contradict or otherwise render the opinion unreasonable, it cannot support a jury's verdict. And I submit that's exactly the case here, and I will cut to the quick, because there are two pieces of evidence that were not considered in Dow I, and one of them is really critical. And that is a co-pending application, which issues as a patent, a 398 patent. It's in the appendix, and blue 14, the blue brief on page 14... The blue brief in this case? In this case. Has a picture of a figure 2 in that case, which is really critical to this case. And I ask the Court's indulgence. This, I will note, that the 398 patent is related to the patents in suit in this respect. It has a disclosure, the slope of strain hardening, which is not identical, but substantially parallel to the same disclosure in the patents in suit. The patents in suit were clearly used as a template to prepare it when you compare the two. And moreover, it originally was recited as claiming priority of one of the patents in suit, and all of them had a grandfather or great-grandfather application in common. That was removed, but nevertheless, it is clearly a related patent, and the case law basically says you can look... Well, that may be true, but isn't that a little... Aren't you kind of picking an argument that's kind of difficult? Because, I mean, I understand the arguments about the change in novelists and the change in law, but if your point is that there was stuff that we didn't consider in our earlier opinion that should be considered now, that raises all kinds of questions about waivers and so forth. I mean, it seems to me that's a harder road for you to travel on if you're just saying, well, this case, leave aside change in law, etc. There was a fact out there or information or an argument out there, and the court ignored it, and that's why they were wrong. Your Honor, I'm not saying that because the court ignored it, somehow that changes everything. All I'm saying is we relied on this in our briefs, and the court didn't mention it. And when I explained it, I think you'll see it's very critical because... Well, that's what you're saying, that under the new standards of stuff that before seemed not to be so relevant, now is relevant and shows indefiniteness. I could not have said it better. I agree with you, Your Honor. And the point is, here, Dr. Schau said that the slope is the maximum slope, and the decision was based on his opinion. He admitted that there's not a piece of prior art supporting maximum slope. He admitted that the Dow 4 constructs, all of which were different slopes, were not the maximum slope. He admitted that the only thing the jury had to rely on was his ipso dixit, his say-so. And when you look at the 398 patent, I hope you will agree that this shows that he was clearly wrong. Because what it shows is, it's got the figure that was missing from the patents in suit. There was a figure one, Your Honor will remember, that there was a figure one, and for some reason it was not included. But this patent has a disclosure which parallels the key disclosure in the patents in suit, and this picture is the figure which, I suggest, probably looks pretty much like the figure one that was missing. And what it shows, whether it does or not, is highly relevant, because it shows you a strain-hardening curve. And it shows you the strain-hardening curve is not a point, which the Dow 1 seemed to suggest, that the strain-hardening curve is a single point. It's not a straight line, it's a curve. And it suggests that the curve, that the slope of strain-hardening is not the maximum slope, it's the 10% secant tangent slope. That is one of the four slopes that GE used internally, and while the court said in its earlier opinion that there's no evidence that they were using the same invention, or the same claim, or whatever it was, the fact is it shows you there are four choices, and probably more. This one shows the choice is not the maximum slope, it's the 10% secant slope. But with regard to that point, I think it's the same one. I think the opinion earlier said, okay, there are four choices, but that's okay, because it's almost like an enablement question, that one could, if there's a limited amount of choices, I think the opinion said, then that's sort of acceptable. We said claims are not indefinite, even if some experimentation is required to determine the exact slope of the claim. Is that, the law in that regard, assuming the panel was correct in its statement of the law, as it should then, is that aspect of the law changed under Nautilus? Yes, there has to be reasonable certainty, and let me give you an example. In the prosecution history of the patents and suits, they distinguished a reference, and they distinguished it on the basis of using a slope other than, they used the maximum slope, they used the slope other than the maximum slope. And the end result was, in that case, they didn't infringe. Had they used the maximum slope, they would have infringed. My point is, NOVA, and everybody else in the country, needs to know with reasonable certainty, when they take acts, are they likely to infringe, or not likely to infringe. If there are multiple choices, if all the evidence shows that the choice would not have been the maximum slope, but some other slope, whether it's two choices, three choices, or four choices, the fact is, that's not reasonable certainty. It may have been proper under the prior Exxon test, which is where all these earlier quotes come from, but it is not proper under a reasonable certainty test, and I submit that when you've got an expert witness who admits he has nothing supporting him, who says, you just have to take my word, and all the evidence in the record is contrary to what he says, that is anything but reasonable certainty. And I submit that that does not satisfy the Supreme Court's guidelines in Nautilus. Now, do you want to spend a minute on your friend's argument that we shouldn't even be repeating this analysis at this juncture of a case? I'm sorry, I didn't understand that. The argument that the other side makes is that this issue isn't properly before us for revisiting at this juncture of a case. The question of indefinite. Absolutely. They make multiple arguments. One is they question jurisdiction. They said that this is an interlocutory appeal under 54b, and it's improper to consider it. This is an intervening change in the law, and the intervening change in the law, the rule is proscenius governs this rule. The case has to be entirely concluded for it to be foreclosed from finality. I don't think that's the right test. I think it's law of the case. In this proceeding on supplemental damages, they're saying that the indefinite, this ruling in the earlier proceeding, is the law of the case. The law of the case. Permits you to reexamine the question when there's an intervening Supreme Court court. Your Honor, there's an intervening law exception to law of the case. We cite the cases on yellow, 25 and 26, and the law of the case does not apply to an intervening law. They said we should have raised this in the case below. Nautilus was decided by the Supreme Court after the decision on supplemental damages. We couldn't raise it before. There's an intervening law exception to law of the case, and proscenius, the prior case, was an interlocutory appeal. It's not under 54B. It was under 1292C2, which is final except for an accounting and a patent case. So all I'm saying is there are arguments that this court should not consider this issue, in my humble opinion, are clearly wrong and inconsistent with all the case law that I know of. Mr. Denner, let me just ask you some cleanup questions. For example, Gow claims that his expert, Soros, who you were discussing a few minutes ago, didn't testify that the separation component B from the whole product was, quote, clean, close quote. Where in the record does he say it was clean? Your Honor, is that the next appeal? I think that's the next appeal. Can I save my answer for the next appeal? I never give an answer like that, but I've never been involved in two appeals one after the other. I'm mixing questions here. Soros is the expert in the other case. Okay. Chau is the expert in this case. Right. I apologize. No, I apologize. So, let me talk. If there are no more questions on the slope issue, I'd like to talk a little about the SHC coefficient unit. You're in your rebuttal time. I'll see if I can make it quick. I'll save my time. Okay. Thank you. Thank you. Please record. Let me, if I can, just briefly start by addressing some of these finality questions. Well, actually, let me ask you a different question, okay? And, Page, your expert, Mr. Chau, testified with respect to indefinite. He said that a person of ordinary skill in the art would know to take this measurement at the maximum slope. And you recognize, on Page 45 of your red brief, that there are at least three different methods of doing that measurement. The final slope method, the 10 percent C contingent method, which I take it is the same as the method in the 398 patent, and the most linear method. And then your expert went on to testify that, with respect to these different methods, they yielded different results, at least under some circumstances. Correct? I think they were all after the maximum slope. Yeah, but measuring the maximum slope under these three different methods produced different results. I don't think so. Well, I can show you where he says that. I didn't think he actually said that. But I think it's- Well, this is important because the question is, if there are three different methods, and he doesn't testify that a passata would have known how to choose among these three methods, and that he provides his own method, that seems to me we're getting into an indefiniteness problem. Let's just assume for the moment. I can show you where he says it. But he says that these methods produce different results than his method. Let's assume that that's the case. Okay. Doesn't that create an indefiniteness problem under the new Nautilus test, because you have different methods of doing these measurements, as I understand it, perhaps as many as four, and that yield different results? Doesn't that suggest that it's indefinite? Well, there's a number of questions there, but I'll get to your last thing. One thing I really want to make clear is that they do say in the brief that we said there were four. That's definitely not true. That's a total misstatement. We did not say four. The one of the four that they have is- I'm looking at page 45 of your own brief, where you talk about the final slope method, the 10% secant tangent method, and the most linear method. Yes. And you say each of these methods is simply a different way of determining maximum slope. Those are three. Okay. But it doesn't make any- I would say that his own method is the fourth one. I'm not saying the early slope method is the method of doing this. Okay. I just want to make the point that- Yeah, that's fine. If they're wrong in saying they're near the slope. Three, four, whatever, there are different ways of doing this that yield different results. And your expert did not say that a passata would have known how to choose among those three, let's say, three methods. Correct? I think he always said there's only one maximum. Yes, but there's only one maximum. But there are three methods of determining the maximum. That's the point. And the three methods of determining the maximum yield different results. Well, under your assumption, the three methods could, but that might well depend upon a particular curve, in which case one method might be the correct method for that particular curve. You're still trying to find the maximum, and there can only be one maximum. Well, there can only be one maximum, but there are three different methods of determining the maximum, which, when cranked into the equation here, yield different results. And I think we pointed out in that portion of the brief on pages 46 and 47 how the post-editor would actually go about determining the maximum, even in light of those. But your witness didn't testify that a passata would have known how to choose among the three or four different methods that are available, right? Well, I think I would say fundamentally he said, yes, you have to find the maximum. Well, of course, that's not the question. The question is, what's the method for finding the maximum? And he recognized that different methods yield different results, and he did not say that a passata would have known which method to choose, correct? Well, I think he... I would say he always said you find the maximum, and I think that there's only one maximum in a curve. Well, that's true, but you're not addressing my question. My question is, there are three different methods of determining the maximum. And he said that the three different methods yielded different results. Just assume for the moment that I'm correct about that, that there are at least three, maybe four different methods of determining the maximum and determining what the slope is, and they yield different results. If that's correct as a factual matter, if that's in fact what your expert testified to, doesn't that make it indefinite under the Nautilus standards?  And I think a lot of that comes in that because the 398 patent that we're talking about was filed much, much later. But in any event, and the figure here does not represent those methods. Nevertheless, to answer your question, if there were three different methods at the time and there was no way to choose between them, then you might have an issue. But I think that he was very clear about how, if you look at one of these stress-strain curves, anybody still in the art would look at that and know there's one maximum. That's true, but he does not say that the method he used, the regression method he used, would have been chosen among the available different methods for doing that. Well, I mean, I think there are frequently different methods for finding the maximum. I think it's the same thing, and I think all these techniques were developed to find the maximum. In fact, I think it's the same thing. That's the problem. They're different methods. They yield different results, and the patent doesn't tell you which one to use. The patent just tells you to find the maximum. It doesn't tell you any specific method. That's the problem, yes. I mean, that's what Judge Dyke, I think, is saying, that it doesn't tell you which method. And there were clearly alternative methods, and that typically they might yield the same result, but there are instances where they yield different results. So on the first factor, you're right, but on the number of methods and the same result, there is a problem. I would submit that the way you said it, Your Honor, is correct. In other words, in specific instances, those methods might yield different results. That does not mean that one skilled in the art would not know which of those methods, in that particular case, was the one that gave you the maximum slope. Well, where does your expert say that, that someone skilled in the art would have chosen his method? He said he invented his own method. He doesn't say that a passata would have known what his method was. No, he's saying that a passata has to find the maximum slope. Yes, and he's saying on page 45 of your brief that there are at least three different methods for doing that. And then when he was asked about the three different methods, he said they yielded different results sometimes. All right, let's say there's three different methods, and you measure it, and you get different results. Only one of them is maximum. No, you say on page 45 of your brief that each of these methods is simply a different way of determining the maximum. Correct. One is 1.2, one is 1.3, and one is 1.4. You know that 1.4 is the maximum. So with a particular curve, a method might not be the right method to use. But why do you know it's the right one? Because one of them is going to give you the maximum. So you're going to know it. It's definite, absolute. But that's not what you said in your brief. You said there are three different methods of determining the maximum slope. Well, I mean, as I say, these stress-strain curves don't all look identical. Some are curved, some are straight. We're not talking about different curves. We're talking about, with respect to a single curve, there are three different methods of determining the maximum. Well, in a particular case, for example, the 10% secant modulus might not work because one skill of the art looks at it, and it says, in that case, with that 10% secant modulus, it's not going to give me, or I can measure it, but it's not going to be the maximum slope. So that's not the maximum slope. Where does your expert say this? Well, Your Honor, I don't think we had this discussion with him. Where does your expert say this, what you just said? I've read a lot of his testimony. I don't see that in there. He says it when he says you would know to find the maximum slope. Yes, but what he doesn't say is that there aren't different methods of doing that, and you can see it in your brief that there are different methods of doing that. But those are different methods. Am I correct that whatever methods or a group of methods are used, there's eventually still only one maximum? Exactly right. And he testified, why is the slope of strain hardening not always at the end of the curve, for example? Because sometimes the samples have end effects or pre-breaks. So they have many methods that they can use. The point is, as Your Honor mentioned, you're always going to know which one is the maximum, and so it tells you specifically. I think you're not saying the same thing you said in your brief, but why don't you go on. Okay. And I think, by the way, I think, Your Honor, we pointed to this. This is A2436 in the appendix, and I think this is the portion that we refer to in the brief. That's A2436, the Shouse test book. Yes, 2435 to 36. But, Your Honor, if I can, coming to the law of the case issue, I think, first of all, we do have to decide whether the panel decision applied the wrong law. In fact, I think it's pretty clear. But if it did, the original decision, if it applied law that was different from Nautilus, we don't apply law of the case for that, right? I agree. And I think that's exactly right, because if you look at what the court said there, and I'll just point out, with respect to maximum slope, the court said, okay, that patent tells you that one who worked in a facility in New York would know that the maximum slope of the stress-strain curve was the appropriate value. And, as I said, I'm assuming now that you would always know, no matter what method you used, what the maximum was. And with respect to units, the court said the same thing. And then, in the Nautilus remand, the... Can I ask you, there's some language. I mean, I know you make a point in your brief that the words insolubly ambiguous were not used in the first appeal. Yes. That's true. But there's statements there that say claims are not indefinite, even if some experimentation is required to determine the exact scope of the claim. It says, the test for indefiniteness is not what the scope of the claim is easier to determine, but whether, quote, and this is quoting Exxon, the meaning of the claim is discernible, even though the test may be formidable and the conclusion may be one over which reasonable persons will disagree. And it cites the page in Exxon, which is also the one, this quote in Exxon, follows the reference to insolubly ambiguous. Does what I cited to you remain the right test after the Supreme Court's opinion in Nautilus? Well, can I answer it this way? No, I mean, you can do whatever you want, but I'd like you to answer the question like in a yes or no, because that's what I really want to know. I mean, it's a direct question. Are these quotes that I asked you in terms of setting out the test consistent with what the Supreme Court has told us in Nautilus' opinion? Well, they gave a number of examples there. Where, in our opinion? No, in what you were just, yes, in your opinion. You were reading from your opinion, I think. Yeah, I was reading the quote that we had in our opinion from Exxon. The latter part was the quote from Exxon. The meaning of the claim is discernible, even though the test may be formidable and the conclusion may be one over which reasonable persons will disagree. Yeah, I think that, I don't think that's a situation you had there. I think that was the background. If I remember, that was a background that was laid out, kind of getting to the narrowing down. No, it's right in the heart. It's not in the background section discussing what the law is. It's right in the heart of the analysis. This is on the unit measurement section, but this is really interspersed with the actual. The actual test the court actually did adopt was because one of skill in the art would understand the bounds of the claims. Where are you reading from the appendix? I'm reading 458 Appendix of APX 920. I'm not finding it exactly. Oh, it's following the quote I had, actually. Yeah. In sum, because one of skill in the art would understand the bounds of the claims, the district court. Okay. Yes, that's absolutely, that's entirely consistent with Nautilus. In fact, that's pretty much the. Okay, but that quote, that actually, that sentence follows two sentences, the quote that I gave you. Right. So, I don't know how. I guess what I'm saying is in the beginning, they're kind of explaining how they're narrowing down. They're explaining how the test is narrowed down to this one. This is the one that was used, and this is the correct one, and this is the one. Okay, but it's the quote that I read for you from Exxon, which proceeds by two sentences, the quote you're relying on. Is that consistent with the Supreme Court's opinion in Nautilus? Reasonable people will disagree. Take that one. All right. That's kind of an odd answer, given that we're dealing with the whole thing of reasonable certainty or whatever. I mean. I think that's one of the ones you read. Yeah. So, I think, yes, that could be consistent with Nautilus. The reasonable people could disagree. In fact, I think in the Nautilus case, the judges disagreed. The Supreme Court didn't hold it as indefinite. I mean, I think reasonable people can disagree. The question is whether one still in the arc would understand the bounds of the claims. In other words, reasonable people. With reasonable certainty. We could have said there's reasonable certainty. Exactly. I don't know. I mean, so your position is even though reasonable people could disagree, there's reasonable certainty. There could be. Yes. In other words, because if you look at what a person who's already still in the arc, the positive would conclude, if he can understand the bounds of the claims. So, you're saying reasonable people is different than reasonable persons still in the arc. I am. Exactly. Well, suppose reasonable people still in the arc could disagree. Is it indefinite then? I think if you took a lot of different people, sometimes you might get some disagreements. What's the answer? If reasonable people still in the arc could disagree about it, is it indefinite? I think the answer is because if one skilled in the arc would understand the bounds of the claims, the district court correctly rejected Bova's indefinite argument. Yes. Isn't the core of your argument really that a person skilled in the arc would understand with reasonable certainty that what you're looking for is the maximum slope? That's exactly right. However you get to it, whatever way you determine the maximum, whatever comes out as the maximum, if you apply five different tests or ten different tests, that's what you're looking for. Exactly. Is it okay to have five different tests that reach different results and that it's not indefinite? I think if you can readily ascertain the maximum, yes. I mean readily ascertain. You've got five different tests. You've got ten different tests. Okay, so you've got 1.1, 1.2, 1.3, 1.8, 1.85. Bingo. But the hypothetical is let's assume there are five different methods for determining the maximum that yield five different results and the patent doesn't tell you which one to use. Does that make it indefinite? No. And the reason is there's so many different kinds and shapes of these curves. No, no, for a single curve. The hypothetical is for a single curve, there are five different methods for determining the maximum slope and each one of them yields a different result. If under that hypothetical, is the claim indefinite? Well, I would still say no because there's one that's the maximum. No, it's different ways of determining the maximum. Well, but you're going to get results... You're rejecting my hypothetical. There are five different ways of determining the maximum. They yield different results for the same curve. Okay, first of all... Is there indefiniteness or not? I mean, the only way I can answer that, frankly, is to say that those would all yield numbers. And the one that was the maximum number... If you measured all five ways, one of them would give you the maximum and that would be the maximum. You're changing the hypothetical. What I'm saying is there are five different ways of determining the maximum and they yield different results. Is it indefinite? Well, maybe I can get it. Maybe I can get it this way. If one skilled in the art knew that there were different ways of measuring the maximum for this particular curve, then I submit that what he would do is use those techniques and then select the number that was, in fact, the maximum. So he has to use all of the techniques? There's an indeterminate number of techniques, perhaps. No, I don't think he would have to because I think he could look at the specific curve at hand and decide which is the best technique to use to find the maximum. But I don't think that any of the testimony says that for one single curve... I thought you were telling us a few minutes ago that you don't know what the maximum is until you employ all of these alternative ways to divide it and then you look at the numbers and you say, well, we've used five methods and we've got five different calculations. Clearly among those five answers, one of them is the maximum. Is that what you were telling us before? So that means you're required, in order to ascertain the maximum, you're required to use multiple techniques? No. I was trying to respond to Judge Dyke in the sense that if the person skilled in the art has one curve in front of them and he knows that for this curve there are five different methods, that in that specific case, to me that's a very strange hypothetical, but I'm accepting the hypothetical. Well, I thought that's what you were saying in this case. The reason it's definite is because even if you have five different alternatives and even if they might yield different results, it's okay because at the end of the day, you use all those methods, you see the results, and you pick the number that's the maximum. Yes. I thought that's what you were saying. So you're saying that under this patent, in order to ascertain what the maximum is, you have to do all of this and then compare the results and you can get to the maximum. Well, I... I'm just trying to retake what I understand is your position. I think I would say that for many instances, you would look at the curve and you'd know which technique you would. You wouldn't actually have to go through all the methods. Did your expert say that? Did you look at the curve and then you know which technique to apply? We didn't really have this in-depth conversation. He wasn't cross-examined on that. He said, I have a method of regression analysis. This is the method I use to do it. At the same time, there are different methods that Posadas would use, which yield different results. That's a problem. I mean, like he used a computer method. You could use a hand method. You could use, you know, another kind of computerized graphical method. There's all kinds of methods you could use. The point is... And they yield different results for the maximum. If they do yield different results, then you nevertheless know what the maximum is. Because you have to do all of the alternative methods and then look at the results and then figure out which is the maximum from those. Well, I suppose the question is, would a person skilled in the art use those different methods? And I think in most instances, you wouldn't have to. Because the curve... If you look at the curve here, that's the maximum right there. You're going to find that maximum. I mean, you're going to look at... In many instances, these curves are not... These, quote, curves are not curved in the steady-hardening range. They're a straight line. Sometimes they're curved. Sometimes you have end effects that break off. So, for example... Let me try a different hypothetical. Suppose a patent says you're trying to determine a certain value. And Posada would say there are five different ways of determining that value that yield five different results. Is that patent indefinite? But we're not talking maximum. I'm using a different hypothetical to try to get away from what I see as a rather confusing description. There's a value. The patent says we're trying to determine X value. The testimony is that Posadas know of five different methods to determine the value, and they yield different results. Is that patent indefinite? If they know which one to choose, it's not. But there's no way that a Posada would choose one method over the other. There are five different methods that a Posada would use. If there's no guidance for him as to which one to use, and these are the ones he has, we're not talking about having a maximum here, then there might be an issue. Might be. So, how does he know in this instance which of those methods to use? The difference between... No, I'm just asking you, with regard to this patent, how does a person skilled in the art know which of the methods to use in the first instance? Well, in other words, let's say you have a curve like this. You know, obviously, the maximum is right up here. So, you use one of the techniques to give you that maximum. Which one? How do you know which one? I mean, you've got several techniques. They're all going to be very, very close. Well, you say they're very close, but the other part of this is that I thought you recognized that different tests might yield different results. Right. So, in order to know what's the maximum, am I misunderstanding that you have to use all of the alternatives and then see which one is, in fact, yielding the maximum result by comparing the results? Well, for example, if you had this curve and it broke up here and you had an end-effect behavior anomaly, then you would not use a technique that measured the effects of the break effects. It was the anomaly. You would pick one where you knew that this is the maximum slope of the curve. I've got a couple of different ways. Shall use a computer attempt to do it. You could use a graphical way of doing it. You could put a ruler up there against it. Those are all different methods, but you know that you're going to be using, you're going to be finding the maximum. There's no ambiguity here. Okay. We've well exceeded your time. I see I have. Thank you. Thank you so much. Since we would like to keep it even, I'll give you another five minutes, and hopefully you won't need that. Unless you ask me lots of questions, I won't need five minutes. I don't even need one minute. I've been listening to Mr. Roper, and all that he said about using multiple curves and picking the highest, I've read the record. There's nothing in the record about that. I don't know of any testimony about that. The fact is, Judge Wallach asked, would a person of ordinary skill in the art use these other methods? For sure. Why? Because the 398 patent shows the 10% secant tangent approach. That's on blue 14. On blue 13, it shows the four Dow methods internally. People are using other methods, and they're described very differently. I submit that the tests used in Dow 1 do not pass muster under Nautilus. I suggest that Mr. Roper's position is not supported by the record, and I submit the only other thing I would add is that the strain hardening coefficient is a new construct coined by Dow, and one skilled in the art would not know how to deal with that, and I submit this case is hopelessly indefinite, and the court should so find. Thank you.